UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

|                          |     |                          |
|--------------------------|-----|--------------------------|
| SCOTT BERTRAM,           | )   |                          |
|                          | )   |                          |
| Plaintiff,               | )   |                          |
|                          | )   |                          |
| v.                       | )   | Civil No. 19-11298-LTS   |
|                          | )   |                          |
| THOMAS VIGLAS,           | )   |                          |
|                          | )   |                          |
| Defendant.               | )   |                          |

_____

## ORDER ON MOTION FOR SUMMARY JUDGMENT (DOC. NO. 18)

April 16, 2020

SOROKIN, J.

Now pending before the Court is Defendant Thomas Viglas' motion for summary judgment on all claims, Doc. No. 18, which Plaintiff Scott Bertram opposes, Doc. No. 22. For the following reasons, the motion is ALLOWED.

## I.       BACKGROUND[1]

On May 15, 2016, Viglas, a police officer with the Rockland Police Department, was dispatched to 45 Loretta Avenue, Rockland, Massachusetts. Doc. No. 20 ¶¶ 1-2. Viglas' dispatch was in response to a "911 call from Michelle Bertram stating her ex-husband had broken into her house," that "she had locked herself into her upstairs master bedroom," and that "he was trying to break into the room." Id. ¶ 3. Viglas was also informed by another Rockland

_____

[1] Unless specifically noted, these facts are undisputed. "Where material disputes remain, they are highlighted in the court's legal analysis and viewed in the light most favorable to the non-moving party." Davis v. Murphy, No. 13-CV-11900-IT, 2018 WL 1524532 at * 1 (D. Mass. Mar. 28, 2018).

Police Department officer that Bertram was subject to an active 209A "No Abuse"[2] restraining order.  Id.  When Viglas arrived at 45 Loretta Avenue, he found the front door of the house locked but discovered that a rear sliding door was open.  Id. ₱ 5.  Viglas then saw Bertram inside the kitchen area of the house.  Id. ₱ 6.  Viglas, who Bertram says had his gun drawn, then ordered Bertram to place his hands on his head.  Id. ₱ 7.  According to Viglas, Bertram then turned and placed his hands on the kitchen counter behind him, within reach of a steak knife.  Id.  Further, Viglas states that he gave Bertram a second instruction to place his hands on his head, at which point Bertram complied but shouted, "I can be here."  Id. ₱ 8  Bertram, for his part, disputes this account, stating that he "complied with the directions that he heard, and put his hands around his back when directed [to] do so by Viglas."  Doc. No. 24 ₱ 8.  As Viglas was the only police officer on the scene, he placed Plaintiff Bertram in handcuffs to detain him, an action Viglas claims Bertram initially resisted by pulling away from Viglas.  Id. ₱ 9.  Bertram states that he "was not moving" when Viglas told him to "stop resisting" and that he "complied with the directions that he heard, and put his hands around his back when directed do so by Viglas," Doc. No. 23-1 ₱ 25; Doc. No. 24 ₱ 8; however, he does not dispute Viglas' claim that he "started to try to pull away" as Viglas was placing him in handcuffs, id. ₱ 9.  Once Bertram was in handcuffs, additional officers arrived at the house and Bertram was placed in a marked cruiser.  Id.

After determining that the house was no longer dangerous, Viglas directed the dispatch officer to tell Michelle Bertram that it was safe for her to come out of her bedroom and speak to the law enforcement officers who were present.  Id. ₱ 10.  Michelle Bertram came out of the

---

[2] Under Mass. Gen. Laws ch. 209A § 1, "abuse" is defined as "the occurrence of one or more of the following acts between family or household members: (a) attempting to cause or causing physical harm; (b) placing another in fear of imminent serious physical harm; (c) causing another to engage involuntarily in sexual relations by force, threat or duress."

bedroom with a friend, Brendan Henry; Michelle Bertram was, according to Viglas, "visibly shaking and crying" and started to yell, "[W]here are my kids[?] They were with him." Id. ⁋ 11. Then, the officers on the scene located Bertram's children, who were inside of Bertram's vehicle, strapped into child safety seats; the vehicle was not running, and the windows of the vehicle were not down. Id.  While the children were physically unharmed, they appeared to be upset. Id.

Viglas then asked Michelle Bertram and Brendan Henry to fill out witness statements. Michelle Bertram wrote that she had called the police when "she was in her bedroom and heard [her] back slider open." Id. ⁋ 13.  According to Michelle Bertram, Bertram then banged on her locked bedroom door, yelled at her, called her names, and made her "afraid for [her] life."  Id. Brendan Henry wrote that Bertram had tried to pick the lock to the bedroom door, said that "he was going to break the door down," and "threatened to beat [Mr. Henry]."  Id. ⁋ 13.  Mr. Henry also stated that Bertram was "screaming at Michelle[,] calling her a Whore and a Slut," and that Mr. Henry was "in fear for Michelle, her two children[,] and [his] safety."  Id.[3]

After Bertram was transported to the Rockland Police Department, he was charged with four criminal offenses: (1) violation of a restraining order (Mass. Gen. Laws ch. 209A, § 7); (2) breaking and entering in the daytime with intent to commit a felony (Mass. Gen. Laws c. 266, § 18); (3) threats to commit a crime (Mass. Gen. Laws c. 275, § 2); and (4) resisting arrest (Mass. Gen. Laws c. 268. § 32B).  Id. ⁋⁋ 17-18.  In Viglas' incident report, Viglas states that, after being

---

[3] Bertram disputes some of these facts; however, for purposes of summary judgment, the relevant facts are those which were known to Viglas at the time he (1) arrested Bertram and (2) filed an affidavit in support of the criminal complaint process against Bertram.  See Goddard v. Kelley, 629 F. Supp. 2d 115, 124–25 (D. Mass. 2009) ("Whether the arresting officers had probable cause is 'not necessarily based upon the offense actually invoked by the arresting officer but upon whether the facts known at the time of the arrest objectively provided probable cause to arrest.'" (quoting United States v. Jones, 432 F.3d 34, 41 (1st Cir. 2005)).

Mirandized, Bertram explicitly told him that he did not live at the 45 Loretta Avenue home.

Doc. No. 20-3 at 6 ("I asked Bertram if he lived at the home and he stated 'No'").  While

Bertram does not dispute Viglas' recitation of Bertram's statement at the police station, he

objects that Bertram's incident report is incomplete because Bertram "told Viglas that Michelle

did not have exclusive occupancy of the home" and offered to show Viglas "a copy of the

modified restraining order in his car that would show he was able to be in the home at Loretta

Ave." Doc. No. 24 ⁋ 16.  Bertram further attests that he "wanted to make a full statement or

offer exculpatory information, but Viglas did not take a statement from Bertram at the scene or at

the station." Id.  Ultimately, the four criminal charges were dismissed. Id. ⁋ 19.[4]

Additionally, Viglas filed a Report of Children Alleged to be Suffering from Serious

Physical or Emotional Injury and Abuse or Neglect with the Massachusetts Department of

Children and Families ("DCF"). Id. ⁋ 18.  Bertram's counsel affirms that DCF records reveal

the DCF social worker tasked with investigating Bertram's case attributed certain statements to

Viglas, including: (1) that Bertram "is not speaking with the police"; (2) that Bertram "had to be

wrested to the ground during [the] arrest as [Bertram] was observed to be looking at a knife on

the counter"; (3) that Bertram "took [Viglas] down" during the arrest; and (4) that, during the

---

[4] Viglas states that all four charges "were dismissed at the request of the Commonwealth for lack of prosecution as the complaining witness (the plaintiff's wife) invoked her marital privilege." Id. ⁋ 19.  Bertram, however, objects to this characterization of the dismissal, averring that "[t]he docket does not state or support the contention that all charges were dismissed because of Michelle Bertram's assertion of her martial privilege." Doc. No. 24 ⁋ 19.  The criminal docket does include a handwritten notation in the "Sentence or Other Disposition" field of the first recorded charge (breaking and entering) that states "lack of pros. Compl. witness invokes marital privilege." Doc. No. 20-8 at 3.  There is another handwritten notation in the "Sentence or Other Disposition" field of the second recorded charge (threat to commit a crime) that appears to state "w/out prej. — town unable to proceed — police officer witness not available." Id.  In any event, in the memorandum supporting his motion for summary judgment, Viglas concedes that "the criminal case terminated in the plaintiff's favor." Doc. No. 19 at 7.

incident that led to his arrest, Bertram had left his children in his car, which "was not running,"

on a "warm day" with the "windows up," Doc. No. 23-2 ❡ 3 (Affidavit of Bertram's counsel);

and (5) that Bertram's "children were left in a motor vehicle for over 10 minutes while [he] was

breaking into the mother's home to confront her," Doc. No. 20-5 at 3 (description of the "nature

and extent of . . . abuse" in Viglas' report to DCF).

Finally, Bertram affirms that "[a]t multiple hearings, including at a hearing in Hingham

District Court . . . Michelle [Bertram] has testified under oath that Viglas told her that he almost

'had to shoot' [Bertram] when he took [Bertram] into custody on May 15, 2016." Doc. No. 23-1

❡ 32. No recordings or transcripts of these statements are in the record. Viglas disputes this

account of his conversations with Michelle Bertram, admitting only that he spoke to her. Doc.

No. 26 ❡ 40.

Now, Bertram brings this lawsuit alleging violations of his Fourth Amendment rights

under 42 U.S.C. § 1983, as well as several violations of state law, arising out of the

aforementioned events.[5]  Bertram alleges that Viglas failed to properly investigate certain facts

before filing his incident report in support of the application for a criminal complaint submitted

to Hingham District Court. Doc. No. 23 at 1. According to Bertram, Viglas' incident report was

misleading because it failed to state that the restraining order in place against Bertram had been

modified to remove restrictions on his ability to enter the 45 Loretta Avenue residence and

omitted other exculpatory information. Id.  Additionally, Bertram claims that Viglas made false

statements in his report to DCF and, on other occasions, to Bertram's wife Michelle, statements

---

[5] Bertram's Complaint includes federal and state law claims for false arrest and malicious
prosecution, as well as state law claims for defamation, intentional infliction of emotional
distress, negligence, and negligent infliction of emotional distress. Doc. No. 1-1. In his
opposition to the instant motion, Bertram consented to the dismissal of his two negligence
claims. Doc. No. 23 at 18.

which Bertram says defamed him, led to restrictions on his parental rights, and caused him

mental and emotional harm.  Id. at 18; Doc. No. 1-1 ¶ 30.  Viglas has moved for summary

judgment on all counts, Doc. No. 18, which Bertram opposes, Doc. No. 22.

## II.    LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). Once a party "has properly supported its motion for summary judgment, the

burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his

pleading, but must set forth specific facts showing there is a genuine issue for trial.'" Barbour v.

Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 256 (1986)). The Court is "obliged to [] view the record in the light most

favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving

party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  Even so, the

Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation."

Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008) (quoting Medina–Muñoz v. R.J. Reynolds

Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).  A court may enter summary judgment "against a

party who fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986).

## III.    DISCUSSION

The Court first considers Viglas' motion for summary judgment as to Bertram's federal

law claims for false arrest and malicious prosecution, both brought under 42 U.S.C. § 1983 and

alleging violations of Bertram's rights under the Fourth Amendment to the United States

Constitution.  Then, the Court turns to the motion for summary judgment as to Bertram's state law claims for false arrest, malicious prosecution, defamation, and intentional infliction of emotional distress.

A. <u>Federal Law Claims</u>

1. <u>Count I (§ 1983 False Arrest)</u>

First, Viglas moves for summary judgment on Count I of Bertram's Complaint, which alleges that Viglas arrested Bertram "without probable cause to believe that Bertram had committed" the four charged offenses, Doc. No. 1-1 at 6, thus violating Bertram's "Fourth Amendment right to be free from an unreasonable seizure."  <u>Pena-Borrero v. Estremeda</u>, 365 F.3d 7, 12 n.8 (1st Cir. 2004) (characterizing the constitutional basis for a § 1983 false arrest claim); <u>accord</u> <u>Albright v. Oliver</u>, 510 U.S. 266, 274 (1994) (plurality opinion) (holding that "deprivations of liberty that go hand in hand with criminal prosecutions" are properly analyzed under the Fourth Amendment).  Accordingly, this claim turns "upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offense."  <u>Beck v. State of Ohio</u>, 379 U.S. 89, 91 (1964).

In this case, even viewing the facts in the light most favorable to Bertram, the record establishes that this arrest was supported by probable cause.  Here, Viglas arrived at 45 Loretta Avenue after the Rockland Police Department received a 911 call stating that Bertram was attempting to break into his ex-wife's bedroom and that she had locked herself into her bedroom out of fear for her safety.  Doc. No. 20 ¶ 3.  Viglas was also notified that Bertram was restrained from "abusing" his ex-wife, which Massachusetts state law defines, in relevant part, as "placing

another in fear of imminent serious physical harm."  Mass. Gen. Laws ch. 209A § 1.  At the

scene, both Michelle Bertram and Brendan Henry provided contemporaneous witness statements

indicating that Bertram had threatened violence, caused them to fear for their physical safety, and

screamed slurs at them. Id. ¶¶ 12-13.  According to Michelle Bertram's Victim Statement,

Bertram "kept trying to open the lock [to her bedroom door] but [Michelle] held the lock down

for about 10 min[utes]."  Doc. 20-6 at 2.  Similarly, Brendan Henry wrote in his Witness

Statement that Bertram was "screaming at Michelle[,] calling her a Whore and a Slut," and that

Henry was "in fear for Michelle, her two children[,] and [his] safety."  Doc. No. 20 ¶ 13.  Given

these circumstances, a reasonable policer officer in Viglas' shoes would have probable cause to

believe, at the very least, that (1) Bertram had acted in violation of his 209A No Abuse

Restraining Order by placing Michelle "in fear of imminent serious physical harm," and (2)

Bertram had threatened to commit bodily harm against another person.

Bertram levels multiple objections to this conclusion, none of which have merit.  First, in

his affidavit accompanying his opposition to the instant motion, Bertram denies Michelle

Bertram's and Brendan Henry's version of events, claiming that he "did not try to enter the

[bedroom] and [he] did not threaten Mr. Henry."  Doc. No. 23-1 ¶ 23.  But Bertram's denials are

of no moment. "Probable cause to arrest exists if, at the moment of the arrest, the facts and

circumstances within the relevant actors' knowledge and of which they had reasonably reliable

information were adequate to warrant a prudent person in believing that the object of his

suspicions had perpetrated or was poised to perpetrate an offense."  Roche v. John Hancock Mut.

Life Ins. Co., 81 F.3d 249, 254 (1st Cir. 1996).  Further, courts have consistently recognized that

"information furnished by a victim is generally considered sufficiently reliable to support a

finding of probable cause."  Holder v. Town of Sandown, 585 F.3d 500, 505 (1st Cir. 2009).

Indeed, the First Circuit has affirmed that, "[i]n the absence of circumstances that would raise a reasonably prudent officer's antennae[,] . . . [t]he uncorroborated testimony of a victim or other percipient witness, standing alone, ordinarily can support a finding of probable cause." Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 10 (1st Cir. 2004). Thus, Viglas' reliance on Michelle Bertram's and Brendan Henry's statements were sufficient to establish probable cause, notwithstanding Bertram's denials.

Second, Bertram argues that Viglas lacked probable cause to arrest Bertram for breaking and entering and resisting arrest. Doc. No. 23 at 10-12. However, courts have long recognized the "principle that allows probable cause for an arrest on any crime to foreclose a false arrest claim[.]" Wilson v. Town of Fairhaven, No. CV 18-11099-PBS, 2019 WL 1757780, at *21 n.35 (D. Mass. Mar. 4, 2019), report and recommendation adopted, No. 1:18-CV-11099, 2019 WL 1760591 (D. Mass. Mar. 19, 2019). Given the Court's conclusion that probable cause supported, at the very least, the arrest for two of the four charges lodged against him, Bertram's § 1983 false arrest claim fails in toto.[6]

Finally, Bertram argues that "[t]here was no probable cause to arrest" Bertram "without a hearing before a magistrate" pursuant to Massachusetts state law, which requires, in some instances, a hearing before a magistrate prior to the issuance of criminal process. Doc. No. 23 at 8; see Mass. Gen. Laws ch. 218 § 35A. Even if Viglas did not comply with these procedures—which the Court does not hold and need not address—the state statute provides no civil cause of action and the only remedy for its violation is "dismissal of [a criminal] compliant" so that the criminal "procedure [may] then start anew." Com. v. Lyons, 492 N.E.2d 1142, 1145 (Mass.

---

[6] The Court addresses whether there was probable cause sufficient to commence criminal process as to resisting arrest and breaking and entering when it takes up Viglas' motion for summary judgment as to Bertram's § 1983 malicious prosecution claim, see infra Section III.A.2.

1986).  The Supreme Judicial Court has held that "[t]he right afforded by § 35A is not closely

affiliated with any constitutional guarantee," and has noted that "[i]ts violation carries no

substantial risk of lasting prejudice to the defendant."  Id.  Thus, alleged failure to comply with

its strictures cannot give rise to a constitutional claim under federal law.

Accordingly, Viglas' motion for summary judgment as to Count I of the Complaint ("42

U.S.C. § 1983, False Arrest"), is ALLOWED.[7]

2.  Count II (§ 1983 Malicious Prosecution)

Next, Viglas moves for summary judgment on Count II of Bertram's Complaint, which

alleges that Viglas "commenced or caused to be commenced a criminal prosecution in the

Hingham District Court, instituted with malice and without probable cause," which Bertram

further alleges violated his rights under the Fourth Amendment.  Doc. No. 1-1 at 6.

In order to successfully bring a § 1983 malicious prosecution claim in the First Circuit, a

plaintiff must establish that "the defendant (1) caused (2) a seizure of the plaintiff pursuant to

legal process unsupported by probable cause, and (3) criminal proceedings terminated in

plaintiff's favor."  Hernandez-Cuevas v. Taylor, 723 F.3d 91, 101 (1st Cir. 2013) (quoting Evans

v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012)).  When adopting this framework, the First

Circuit taught that the Fourth Amendment inquiry at the heart of a § 1983 malicious prosecution

claim must be analyzed "under the Supreme Court's reasoning in Franks v. Delaware," which

demands that a

---

[7] The Court concludes that Viglas is also entitled to qualified immunity with respect to this
claim.  Indeed, the First Circuit has "explained that, with respect to a § 1983 claim that seeks to
hold a police officer liable for making [an] arrest without probable cause, 'if the presence of
probable cause is arguable or subject to legitimate question, qualified immunity will attach.'"
Wilber v. Curtis, 872 F.3d 15, 21 (1st Cir. 2017) (quoting Cox v. Hainey, 391 F.3d 25, 31 (1st
Cir. 2004)).

> plaintiff must demonstrate that—despite the magistrate's determination that the evidence presented was, on its face, sufficient to establish probable cause—that evidence was, in fact, constitutionally unacceptable because the officers formulated evidence essential to the probable cause determination with a mental state similar to common law malice.

Id. (citing Franks v. Delaware, 438 U.S. 154 (1978)).  The First Circuit has since clarified that the "Franks test" for assessing a magistrate's probable cause determination contains three elements: (1) "[t]he affidavit [submitted by an officer in support of probable cause] need contain a falsehood"; (2) "the falsehood must be such that its deletion would eliminate probable cause"; and (3) "the falsehood must have been made deliberately, or at least with reckless disregard for the truth."  Jordan v. Town of Waldoboro, 943 F.3d 532, 541 (1st Cir. 2019).

At the outset, the Court notes that there is a dispute amongst the United States Courts of Appeals as to whether this searching inquiry is necessary where, as here, the Court has already determined that probable cause supported at least some of the charges brought against Bertram in Hingham District Court.[8]  For example, the United States Court of Appeals for the Sixth Circuit recently held that where "there was probable cause for [one] charge [in a multi-charge criminal complaint], [the plaintiff could not] move forward with any of his [§ 1983] malicious-prosecution claims."  Howse v. Hodous, No. 19-3418, 2020 WL 1284959, at *4 (6th Cir. Mar. 18, 2020) (emphasis in original).  There, the Sixth Circuit reasoned that because "malicious-prosecution claims are based on the Fourth Amendment" and "hinge on an alleged unreasonable seizure," such claims, like false arrest claims, "fail[] so long as there's just one valid reason" for the alleged "unreasonable prosecutorial seizure" that triggered the purported malicious

---

[8] In assessing Bertram's § 1983 false arrest claim, the Court has already concluded that probable cause supported charges for violation of a restraining order and threats to commit a crime; thus, Bertram's § 1983 malicious prosecution claim necessarily fails insofar as it is based on the initiation of criminal process as to those two charges.  See supra n.6.

prosecution.  Id. (quoting Sykes v. Anderson, 625 F.3d 294, 310 (6th Cir. 2010).  However, the

United States Courts of Appeals for the Second, Third, Seventh, and Eleventh Circuits disagree.

See Posr v. Doherty, 944 F.2d 91, 100 (2d Cir. 1991) (holding that a malicious prosecution claim

can proceed even when a separate charge is supported by probable cause); Johnson v. Knorr, 477

F.3d 75, 83 (3d Cir. 2007) (declining to "establish legal precedent of such broad application that

it would 'insulate' law enforcement officers from liability for malicious prosecution in all cases

in which they had probable cause for the arrest of the plaintiff on any one charge"); Holmes v.

Vill. of Hoffman Estate, 511 F.3d 673, 682 (7th Cir. 2007) (holding that "the basis for each

charge must be examined separately, and if probable cause was lacking as to any charge, the

defendant[] still may be held liable for his prosecution on that unsupported charge"); Elmore v.

Fulton Cnty. Sch. Dist., 605 Fed. App'x 906, 915 (11th Cir. 2015) ("[I]n contrast to false-arrest

claims, probable cause as to one charge will not bar a malicious prosecution claim based on a

second, distinct charge as to which probable cause was lacking.").  The First Circuit, for its part,

"has not definitively ruled on the subject," though "it has acknowledged [the] trend in other

circuits" towards analyzing each charge separately when considering malicious prosecution

claims.  Mendonca v. City of Providence, 170 F. Supp. 3d 290, 302 (D.R.I. 2016); see also

Rivera–Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 38 (1st Cir. 1993) (noting

that "courts have permitted [malicious prosecution] actions if the charges stem from different

sets of facts and if all the other elements of a malicious prosecution claim are fulfilled").  At least

one session of the District of Massachusetts has recently adopted the majority approach.  See

Wilson, 2019 WL 1757780, at *21 n.35 (holding that "probable cause to institute criminal

proceedings for one charge [does not] foreclose a malicious prosecution claim when other

charge(s) lack such probable cause").

Based on this case law—and without contrary binding authority from the First Circuit—the Court adopts the majority, charge-specific approach to analyzing Bertram's malicious prosecution claim.  See Mendonca, 170 F. Supp. 3d at 302 (noting that, unlike an arrest, "once an individual is prosecuted, each additional charge imposes additional costs and burdens"); accord Holmes, 511 F.3d at 682 (holding that "when it comes to prosecution, the number and nature of the charges matters: the accused must investigate and prepare a defense to each charge, and as the list of charges lengthens (along with the sentence to which the accused is exposed), the cost and psychic toll of the prosecution on the accused increase.").  Accordingly, the Court now considers, as to both the resisting arrest and breaking and entering charges: (1) whether Bertram has created a genuine issue for trial as to the clerk magistrate's probable cause determination; and (2) whether Viglas is nonetheless entitled to qualified immunity, and thus summary judgment in his favor.

a.   § 1983 Malicious Prosecution for Resisting Arrest

As to the resisting arrest charge, Bertram argues that a malicious prosecution claim lies because (1) he was not under arrest at the time that he was placed in handcuffs and that "purported 'resistance' to detention for safety purposes does not support the charge of resisting arrest"; and (2) Viglas' incident report—which supported the clerk magistrate's probable cause determination—was inaccurate and misleading because Bertram's conduct did not constitute "resistance."  Doc. No. 23 at 9-10.  Both theories are unavailing.

The Court begins this inquiry with a careful review of the facts.  According to Bertram, he "complied immediately, following every direction" issued by Viglas during the encounter in the kitchen of 45 Loretta Avenue.  Doc. No. 23-1 ¶ 25.  Bertram does not dispute that he initially placed his hands on the kitchen counter within reach of a steak knife.  Doc. No. 24 ¶ 8.

However, Bertram also states that "was not moving" when Viglas told him to "stop resisting." Id.  Bertram also does not dispute Viglas' account that Bertram "started to try to pull away" when he was placed in handcuffs, id. ¶ 9; however, Bertram states that he "complied with the directions that he heard" and "put his hands around his back when directed do so by Viglas," id. ¶ 8.  Finally, while Bertram argues that he was not under arrest when Viglas placed him in handcuffs, Bertram's affidavit does not dispute that Viglas "intended to effect a formal arrest" when he placed Bertram in handcuffs, United States v. Jones, 609 F. Supp. 2d 113, 129 (D. Mass. 2009) (alterations omitted and emphasis added), and Viglas' incident report does not include statements inconsistent with such an intent, see Doc. No. 20-8 at 14 (stating that Viglas "started to place Bertram in handcuffs to detain him" after Viglas knew that a 209A No Abuse Restraining Order had issued against Bertram and that Michelle Bertram had stated in her 911 call that Bertram had "brok[en] in to her home" and "tr[ied] to break into the room" from which she and Brendan Henry had called the police).  Cf. Com. v. Smith, 772 N.E.2d 1084, 1088 (Mass. App. Ct. 2002) (holding that "the [resisting arrest] statute cannot apply when the police have attempted to seize or detain a person only for the purpose of making a threshold inquiry, as distinct from making an arrest"); Com. v. Pagan, 829 N.E.2d 1168, 1171 (Mass. App. Ct. 2005) (holding that the resisting arrest statute was inapplicable when an officer was "in the process of restraining the defendant in order to conduct a protective pat frisk").

In these circumstances, even viewing the facts in the light most favorable to Bertram, see Davis, 2018 WL 1524532 at * 1, the Court concludes that Bertram has not met his burden to demonstrate that a genuine issue for trial remains.  The Court reaches this conclusion after "examining [Viglas'] affidavit for the presence of falsehoods," as it must under the Franks test, looking "not only for affirmative misrepresentations, but also for material omissions." Jordan,

943 F.3d at 541.  Here, even crediting Bertram's version of events, he does not dispute the

critical fact in Viglas' affidavit: that Bertram "started to pull away from him" as Viglas was

handcuffing him.  Doc. No. 20-8 at 14.  Rather than characterize this statement as a falsehood,

Bertram argues that such conduct "hardly constitutes the type of physical force contemplated by

the [resisting arrest] statute."  Doc. No. 23 at 12.  Even if Bertram's reading of the scope of

Massachusetts' resisting arrest statute is correct—which the Court does not hold and need not

decide—it was the clerk magistrate in Hingham District Court, and not Viglas, who determined

that such conduct was sufficient for the probable cause determination.  Cf. Messerschmidt v.

Millender, 565 U.S. 535, 547–48 (2012) ("[I]t goes without saying that where a magistrate acts

mistakenly in issuing [criminal process] but within the range of professional competence of a

magistrate, the officer who [provided the underlying incident report] cannot be held liable");

United States v. Leon, 468 U.S. 897, 921 (1984) ("It is the magistrate's responsibility to

determine whether the officer's allegations establish probable cause . . . .").

Moreover, even if Viglas had included in his police report the additional facts that

Bertram proffers in his affidavit—namely that Bertram "was not moving" when Viglas told him

to "stop resisting," that Bertram "complied with the directions that he heard," and that Bertram

"put his hands around his back when directed do so by Viglas"—nothing in the record suggests

that this omitted information would have been "critical to the probable cause determination"

made by the clerk magistrate.  United States v. Tanguay, 787 F.3d 44, 49 (1st Cir. 2015) (quoting

Burke v. Town of Walpole, 405 F.3d 66, 81 (1st Cir. 2005)).  Further, the First Circuit has held

that such omissions are constitutionally suspect "only if [they are] 'designed to mislead, or . . .

made in reckless disregard of whether [they] would mislead the magistrate' in his appraisal of

the affidavit."  Id. (quoting United States v. Colkley, 899 F.2d 297, 301 (4th Cir. 1990)).  Even

viewing the facts in the light most favorable to Bertram, he cannot establish that those additional facts from his affidavit—which do not contradict the decisive act that Viglas understood as resistance—would have critically altered the clerk magistrate's probable cause determination or were omitted in an effort to mislead the clerk magistrate as he carried out his task.

Accordingly, Viglas' motion for summary judgment as to Bertram's § 1983 malicious prosecution claim is ALLOWED insofar as it rests upon Viglas' initiation of criminal process for the charge of resisting arrest.[9]

### b.  § 1983 Malicious Prosecution for Breaking and Entering

Bertram similarly contends that a § 1983 malicious prosecution claim lies against Viglas due to his initiation of criminal process as to the breaking and entering charge against Bertram because: (1) Viglas' incident report contained "significant misrepresentations" and "withheld significant exculpatory information," such as the modification of Bertram's 209A Restraining Order; and (2) Viglas fell short of his "duty to investigate" whether Bertram, in fact, had a "right to be on the property before charging him with a criminal offense in connection to his presence on that property."  Doc. No. 23 at 15.  Neither theory establishes a genuine issue for trial.

Once again, the Court begins with a survey of the relevant facts.  According to Viglas' incident report, when Viglas was initially dispatched to the house, another police officer "informed [him] that [there] was an Active 209A Restraining Order stating No Abuse in effect." Doc. No. 20-3 at 5.  The parties agree that twelve days before the incident, the 209A Restraining Order was modified to (1) no longer expressly prohibit contact with Michelle Bertram, and (2) remove a "stay away" order as to the 45 Loretta Avenue house.  Doc. No. 24 ¶ 4.  During the

---

[9] The Court also concludes that any facts that Viglas omitted from his incident report were not required to be included by clearly established Fourth Amendment law; thus, Viglas is entitled to qualified immunity as to this theory in support of Bertram's § 1983 malicious prosecution claim.

encounter in the kitchen of 45 Loretta Avenue, Viglas attests that Betram shouted to him, "I can be here" before he was placed in handcuffs.  Id. ¶ 8.  After Bertram was placed in custody, Michelle Bertram stated that "Scott [Bertram] was not welcome in my home and he made me afraid for my life."  Doc. No. 20-6 at 2.  According to Viglas' incident report, after Bertram was Mirandized, Viglas "asked Bertram if he lived at the home and he stated 'No.'"  Doc. No. 20-3 at 6.  Bertram does not claim that he did not make this statement; rather, Bertram claims that this recitation of the facts is incomplete because he also "told Viglas that Michelle did not have exclusive occupancy of the home" and offered to show Viglas "a copy of the modified restraining order in his car that would show he was able to be in the home at Loretta Ave."  Doc. No. 24 ¶ 16.  Further, Bertram attests that he "wanted to make a full statement or offer exculpatory information, but Viglas did not take a statement from Bertram at the scene or at the station."  Id.

First, even viewing these facts in the light most favorable to Bertram, the record does not contain evidence of "significant misrepresentations" or the omission of "significant exculpatory information" from Viglas' incident report.  Bertram does not dispute that he told Viglas that he did not live at 45 Loretta Avenue, id.; thus, this statement is not an "affirmative misrepresentation."  Jordan, 943 F.3d at 541.  Moreover, information about the modified restraining order could not have materially altered the clerk magistrate's probable cause determination because, contrary to Bertram's assertions, the modified order did not establish that Bertram had an affirmative right to enter 45 Loretta Avenue; it merely removed a prohibition on entering 45 Loretta Avenue.  See Doc. No. 20-10 at 4-5 (removing the order to "stay away from [Michelle Bertram's] residence at 45 Loretta Avenue" at Michelle Bertram's request).  Similarly, even construing all facts and inferences in Bertram's favor, there is no indication that Bertram's

claim "that Michelle did not have exclusive occupancy of the home" would have been "critical to the [clerk magistrate's] probable cause determination." Tanguay, 787 F.3d at 49. At best, the inclusion of this statement in the incident report would have introduced a competing assertion that the clerk magistrate would have weighed against Michelle Bertram's contrary affirmation that Bertram "was not welcome in [her] home and he made [her] afraid for [her] life." Doc. No. 20-6 at 2. Courts have routinely held, and the First Circuit has affirmed, that "[w]hen information comes from a victim or witness . . . there is a presumption that such information carries an indicia of reliability." Forest v. Pawtucket Police Dep't, 290 F. Supp. 2d 215, 227 (D.R.I. 2003), aff'd, 377 F.3d 52 (1st Cir. 2004); Acosta, 386 F.3d at 10 (holding that "[t]he uncorroborated testimony of a victim or other percipient witness" is "ordinarily" sufficient on its own to support a finding of probable cause"); Nelson v. Moore, 470 F.2d 1192, 1197 (1st Cir. 1972) (holding that a victim is deemed to be a "reliable informant" even if "his or her reliability has not theretofore been proven or tested"). In such circumstances, courts have held that even when "defendants would have demonstrated more prudence had they included the inconsistent statements in the affidavit, inclusion of the discrepancies would not have undercut the existence of probable cause." Mutter v. Town of Salem, 945 F. Supp. 402, 407 (D.N.H. 1996).

Second, Bertram's argument that Viglas abdicated his "duty to investigate" similarly fails to establish a genuine issue for trial. The First Circuit has affirmed that when "an officer has a complaint from a seemingly credible eyewitness, 'exculpatory evidence must be substantial' to require the officer to investigate further." United States v. Barbosa, No. 15-CR-10343-IT, 2016 WL 6609174, at *5 (D. Mass. Nov. 7, 2016), aff'd, 896 F.3d 60 (1st Cir. 2018) (quoting Acosta, 386 F.3d at 11). The First Circuit has also held that the "duty to investigate

further only arises in 'highly idiosyncratic circumstances.'" Id. (quoting Acosta, 386 F.3d at 11).

The Court's inquiry into whether such idiosyncratic circumstances exist proceeds thusly:

> the officer must have had "obvious reasons" to doubt either the veracity of the allegations or the credibility of the person making the allegations—doubts of "such a magnitude that her failure to conduct an additional inquiry evinced a reckless disregard for the truth." Faced with such a "red flag," an officer may (depending on the circumstances) have a duty to investigate further before applying for a warrant.

United States v. Barbosa, 896 F.3d 60, 71 (1st Cir.), cert. denied, 139 S. Ct. 579, 202 L. Ed. 2d 412 (2018) (quoting Tanguay, 787 F.3d at 53-54).

Here, there is no such "red flag." Crediting Bertram's version of events, none of the objections he raised during his arrest or when being questioned at the police station gave Viglas an "obvious reason" to doubt Michelle Bertram's allegation that Betram "was not welcome in [her] home" and that "he made [her] afraid for my life." Doc. No. 20-6 at 2. First, Bertram's assertion that "Michelle did not have exclusive occupancy of the home" could not have triggered a duty to investigate further because "[a] reasonable police officer is not required to credit a suspect's story." Cox, 391 F.3d at 32 n.2. Second, Bertram's plea to show Viglas the modified 209A Restraining Order could not have triggered the duty to investigate further because, as explained above, a modified Restraining Order is not evidence of a right to occupy a dwelling; it is merely evidence of the removal of a prohibition on entering that dwelling. Thus, the Court cannot conclude as an undisputed fact that Viglas possessed "knowledge of an obvious and unexplored reason to doubt the truthfulness of [Michelle Bertram's] allegations" as to Bertram's right to enter 45 Loretta Avenue. Tanguay, 787 F.3d at 53.

Accordingly, Viglas' motion for summary judgment as to Bertram's § 1983 malicious prosecution claim is ALLOWED insofar as it rests upon Viglas' initiation of criminal process for the charge of breaking and entering in the daytime with intent to commit a felony.[10]

B. State Law Claims

The Court now turns to Viglas' motion for summary judgment on Bertram's remaining state law claims: false arrest (Count III), malicious prosecution (Count IV), defamation (Count V), and intentional infliction of emotional distress (Count VI).

1. Count III (False Arrest Under Massachusetts State Law)

"False arrest is a species of the tort of false imprisonment" in the state of Massachusetts. Nuon v. City of Lowell, 768 F. Supp. 2d 323, 336 (D. Mass. 2011) (applying Massachusetts law). "Under Massachusetts law, the tort of false imprisonment consists of (1) intentional and (2) unjustified (3) confinement of a person, (4) directly or indirectly (5) of which the person confined is conscious or is harmed by such confinement." Barbosa v. Conlon, 962 F. Supp. 2d 316, 334 (D. Mass. 2013) (internal quotation marks and alterations omitted). "Although probable cause is not an element of false arrest, the existence of probable cause defeats a false arrest claim." Cabot v. Lewis, 241 F. Supp. 3d 239, 259 (D. Mass. 2017); see also Santiago v. Fenton, 891 F.2d 373, 383 (1st Cir. 1989) ("[A]t the foundation of all the claims [including false arrest] is the necessity that the arrest be supported by probable cause."); Felix v. Lugas, 2004 WL 1775996 at *2 n.6 (D. Mass. 2004) ("Although lack of probable cause is not an element to a false arrest claim, its absence provides a sufficient basis to dismiss a false imprisonment or false

---

[10] Necessarily, this conclusion recognizes that Viglas was not "required to undertake additional investigation by clearly established law." Cullen v. Janvrin, 691 F. App'x 643 (1st Cir. 2016). Accordingly, Viglas is also entitled to qualified immunity on this theory of liability.

arrest claim.").  Given the Court's determination that probable cause supported the arrest, <u>see</u> <u>supra</u> Section III.A.1, a genuine issue for trial does not remain as to this claim.

Accordingly, Viglas' motion for summary judgment on Count III of the Complaint is ALLOWED.

2.   <u>Count IV (Malicious Prosecution Under Massachusetts State Law)</u>

In Count IV, Bertram seeks to hold Viglas liable for malicious prosecution under state law.  In order to recover for malicious prosecution under Massachusetts law, the plaintiff must establish that "(1) [he was] damaged because the defendant[] commenced the criminal prosecution without probable cause; (2) that [the defendant] did so with malice or improper purpose, and (3) that the criminal action terminated in [his] favor." <u>Afreedi v. Bennett</u>, 517 F. Supp. 2d 521, 540 (D. Mass. 2007).  Given the Court's earlier determination as to the Hingham District Court clerk magistrate's probable cause determination, <u>see</u> <u>supra</u> Section III.A.2, Bertram's parallel state law claim necessarily fails.  <u>See</u> <u>Afreedi</u>, 517 F. Supp. 2d at 539 (allowing summary judgment as to a malicious prosecution claim under Massachusetts law where the Court "has already determined . . . that [the officer] had probable cause to arrest the Plaintiff[]" or that "the presence of probable cause was [] at least arguable").

Accordingly, Viglas' motion for summary judgment on Count IV of the Complaint is ALLOWED.

3.   <u>Count V (Defamation)</u>

Count V alleges that Viglas made two sets of defamatory statements: (1) statements allegedly made to a DCF social worker tasked with investigating Bertram's case after Viglas filed a Report of Children Alleged to be Suffering from Serious Physical or Emotional Injury and Abuse or Neglect, Doc. No. 24 ¶ 42; and (2) statements allegedly made to Michelle Bertram,

including that Viglas "'had to shoot' [Bertram] when he took [Bertram] into custody on May 15, 2016."  Doc. No. 23-1 ¶ 32.

As to the first set of statements, Viglas, as a mandated reporter of child abuse, may not be held civilly or criminally liable for statements made when filing a report with DCF, so long as the statements were "made in good faith."  Mass. Gen. Laws ch. 119 § 51A(g).  Here, there is no evidence that any of Viglas' alleged statements to the DCF social worker were not made in good faith.  Viewing these alleged statements in the light most favorable to Bertram, at best Bertram has produced evidence that Viglas made misstatements that do not support an inference of bad faith.  For example, Bertram disputes Viglas' characterization of 45 Loretta Avenue as "the mother's home," Doc. No. 20-5 at 3, but has presented no evidence that this was an inaccurate or unfair description.  See supra Section III.A.2 (quoting Michelle Bertram's witness statement and explaining that the modification of Bertram's 209A Restraining Order was not evidence of occupancy rights to 45 Loretta Avenue).  Bertram additionally takes issue with Viglas' characterization of May 15, 2016 as a "warm day" and cites meteorological data collected by the National Oceanic & Atmospheric Administration which indicates that the low temperature for the day was 41 degrees Fahrenheit and the high temperature was 60 degrees, with an average temperature of 51 degrees.  Doc. No. 23-2.  However, Bertram affirms that the incident at 45 Loretta Avenue occurred in the early to mid-afternoon of May 15, 2016, Doc. No. 23-1 ¶ 13, and he provides no evidence as to whether the locked car was in direct sunlight.  Cf. Parked Cars Get Dangerously Hot, Even on Cool Days, Stanford Study Finds, Stan. Med. News Ctr. (July 5, 2005), https://med.stanford.edu/news/all-news/2005/07/parked-cars-get-dangerously-hot-even-on-cool-days-stanford-study-finds.html (summarizing a study performed by Stanford University School of Medicine researchers which found that "[e]ven on a relatively cool day, the

temperature inside a parked car can quickly spike to life-threatening levels if the sun is out" and

advising parents to "take your child with you").  In any event, nothing in the record suggests that

Viglas' characterization of the temperature was made in bad faith.  Finally, as noted above, while

Viglas' alleged representations that Bertram "had to be wrested to the ground during [the] arrest"

and that Viglas "took him down" are inconsistent with the incident report, Doc. No. 23-2 ¶ 3,

these statements, without more, cannot give rise to an inference of bad faith or an ulterior

motive.  Thus, Viglas is entitled to civil immunity for claims arising out of the statements he

made to the DCF social worker.

As to the second set of statements—those allegedly made by Viglas to Michelle

Bertram—Bertram has failed to raise a genuine issue for trial.  According to Bertram's affidavit

in support of his opposition to the instant motion, "[a]t multiple hearings, including at a hearing

in Hingham District Court . . . Michelle [Bertram] has testified under oath that Viglas told her

that he almost 'had to shoot' [Bertram] when he took [Bertram] into custody on May 15, 2016."

Doc. No. 23-1 ¶ 32.  Viglas, for his part, disputes this account of his conversations with Michelle

Bertram, admitting only that he spoke to her.  Doc. No. 26 ¶ 40.

Bertram's offer of proof to substantiate this alleged defamatory statement is inadmissible

hearsay and, as such, is entirely deficient to create a genuine issue for trial.  Under Rule 801(c)

of the Federal Rules of Evidence, hearsay is defined as "a statement, other than one made by the

declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter

asserted."  Fed. R. Evid. 801(c).  Here, Bertram's affidavit is offered to prove the truth of the

matter asserted, namely that Viglas told Michelle Bertram that he almost 'had to shoot'

[Bertram] when he took [Bertram] into custody on May 15, 2016."  Doc. No. 23-1 ¶ 32.  In this

case, Bertram "has no personal knowledge as to whether the defamatory statement was made and

cannot be cross-examined with respect thereto." Pardo Hernandez v. Citibank, N.A., 141 F. Supp. 2d 241, 244 (D.P.R. 2001). His affidavit "therefore falls squarely within the purview of the hearsay rule and is inadmissible." John & Vincent Arduini Inc. v. NYNEX, 129 F. Supp. 2d 162, 173 (N.D.N.Y. 2001); accord GMO Rice v. Hilton Hotel Corp., No. 85–1470, 1987 WL 16851, *1–2 (D.D.C. 1987) ("In this instance, plaintiff seeks to testify that one person ('B') told the plaintiff that another person ('A') made a statement defaming plaintiff. Plaintiff offers this testimony in an effort to show that 'A' did, in fact, make the defamatory statement. This is inadmissible hearsay . . .").

In a footnote, Bertram notes that Viglas' memorandum only addresses Bertram's defamation claim as it pertains to statements made to the DCF social worker. Doc. No. 23 at 18 n.4. While Viglas' memorandum does not address the alleged defamatory statement made to Michelle Bertram, Viglas denies that he made the alleged statement, Doc. No. 26 ⁋ 40, and Viglas' motion for summary judgment asks "the Court to dismiss the Complaint against [Viglas]" without limitation, Doc. No. 18 at 2. Under Rule 56 of the Federal Rules of Civil Procedure, it is Bertram's obligation to "set out facts that would be admissible in evidence," Fed. R. Civ. P. 56(c), or to make a showing "by affidavit or declaration that, for specified reasons, [he] cannot present facts essential to justify [his] opposition" and seek appropriate relief from the Court, Fed. R. Civ. P. 56(d). Where, as here, the nonmoving party has done neither and instead rests its case for defamation on inadmissible hearsay, a genuine issue for trial cannot be established. See Albert v. Loksen, 239 F. 3d 256, 266–67 (2d Cir. 2001) ("When challenged on a motion for summary judgment, a plaintiff may not rely solely on hearsay or conclusory allegations that the slanderous statement was made.").

Accordingly, Viglas' motion for summary judgment on Count V of the Complaint is ALLOWED.

4.   <u>Count VI (Intentional Infliction of Emotional Distress)</u>

Finally, Viglas seeks summary judgment in his favor on Bertram's claim of intentional infliction of emotional distress.  In order to prevail on this claim, Bertram must demonstrate "(1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff's distress; and (4) that the plaintiff suffered severe distress."  <u>Howcroft v. City of Peabody</u>, 747 N.E.2d 729, 747 (Mass. App. Ct. 2001) (quoting <u>Cady v. Marcella</u>, 729 N.E.2d 1125, 1131 (Mass. App. Ct. 2000) (internal quotations and citation omitted)).  Moreover, "[t]o be considered extreme and outrageous, the defendant's conduct must be beyond all bounds of decency and . . . utterly intolerable in a civilized community."  <u>Id.</u>

The Court concludes that no reasonable factfinder could determine that Viglas' conduct was extreme and outrageous.  Where, as here, "probable cause was at least arguable, and a reasonably objective police officer could have determined, based on the evidence that was available at the time" that Bertram committed the charged offenses, Viglas' conduct giving rise to Bertram's arrest, and the subsequent initiation of criminal process, "cannot be deemed extreme and outrageous."  <u>Sheppard v. Aloisi</u>, 384 F. Supp. 2d 478, 495 (D. Mass. 2005); <u>Sholley v. Town of Holliston</u>, 49 F. Supp. 2d 14, 22 (D. Mass. 1999) ("Police officers do not act in an extreme, outrageous, and intolerable manner when they make an arrest based upon probable cause, and the distress that invariably accompanies an arrest, while it can be quite severe, is not beyond the limits of what a reasonable person can be expected to endure.").  Moreover, "[n]either singly nor in combination does the evidence here meet [the high] standard"

to create a genuine issue for trial as to whether Viglas intended to cause emotional distress when he undertook the conduct at issue in this case.  Kinan v. City of Brockton, 876 F.2d 1029, 1037 (1st Cir. 1989); cf. Mercurio v. Town of Sherborn, 287 F. Supp. 3d 109, 125 (D. Mass. 2017) (denying summary judgment where the plaintiff adduced evidence that officers arrested her without cause and used excessive force, and the plaintiff's psychiatrist reported that the plaintiff was traumatized as a result of the events).

Accordingly, Viglas' motion for summary judgment as to Count VI (Intentional Infliction of Emotional Distress) is ALLOWED.

IV.     CONCLUSION

For the foregoing reasons, Viglas' motion for summary judgment, Doc. No. 18, is ALLOWED.

SO ORDERED.

 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge